UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RANDY LOUIS DONALDSON,

                      Petitioner,

      v.

ROBERT JACKSON,

                      Respondent.

CASE NO. 3:25-cv-05354-JHC-DWC

REPORT AND RECOMMENDATION

Noting Date: January 20, 2026

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Randy L. Donaldson, who is represented by counsel, filed his federal habeas petition, under 28 U.S.C. § 2254, seeking relief from his state court convictions and sentence. *See* Dkt. 1. Petitioner raised six grounds in the Petition. *Id.* at 11–13. The Court concludes the state court's adjudication of the grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied and a certificate of appealability not be issued.

REPORT AND RECOMMENDATION - 1

I.      Background

A.  Factual Background

After two mistrials, Petitioner's third trial began in April 2021. Dkt. 1 at 4. A jury found Petitioner guilty of murder in the second degree, assault in the first degree, and assault in the second degree, and the Superior Court of Washington for Pierce County ("trial court") sentenced him to a total of 514 months imprisonment. Dkt. 1, Ex. E at 3. The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> Donaldson and Wilson were hip hop artists who appeared in several of each other's music videos. They went to a Tacoma bar together one night in 2017. Several members of their group attracted attention by throwing money in the air inside of the bar. That night, Foster, Brown, and a group of friends went to the same bar to celebrate Brown passing a military aptitude test. Some of Brown and Foster's friends picked up money from the ground that Donaldson and Wilson's group had thrown in the air. Foster and Brown's group stayed until the bar closed, then left the building. In the bar's parking lot, Foster and Wilson got into an altercation and exchanged punches. Wilson pulled a gun and began shooting at Foster. Another man, identified at trial as Donaldson, ran up and also shot at Foster. Foster was shot seven times in the torso, including one bullet that penetrated his lung and heart. Brown was shot in the hand. Foster died from his wounds. Police recovered thirteen 9 millimeter and four .40 caliber casings from the bar parking lot. The 9 millimeter casings were all fired from one gun and the .40 caliber casings were all fired from a single other gun. The firing pin impression on the 9 millimeter casings was most often seen on bullets fired from Glock guns. A single 9 millimeter bullet, which was not the bullet that killed Foster, was recovered from Foster's body; all other bullets had exited his body. Police could not determine whether a 9 millimeter or .40 caliber bullet was the one that killed him. No firearms were ever recovered in connection with the shooting.
>
> At the scene around 1:45 a.m., Brown described a single shooter to an officer and said the shooter was not the person who had been fighting with her husband. She described "a light-skinned male with dreadlocks pulled back into a ponytail with a grill in his mouth wearing a black hoodie." A "different person" had been fighting with Foster before the shooting. Brown was then taken to the hospital for her hand injury. Shortly after arriving at the hospital around 2:20 a.m., she spoke to a patrol officer. This time, Brown described two shooters to the officer. The first was a "possibly Hispanic male" who was right next to Foster. The second, "who ran up behind later and was shooting," was "a light complexion, high yellow, [B]lack male [who was] five-foot nine to six-foot in height; approximately 170 pounds; late 20s in age; [with] shoulder-length dreadlocks pulled back into a ponytail; gold grille in his mouth; and wearing a black hoodie." Detectives then interviewed Brown early

REPORT AND RECOMMENDATION - 2

in her stay at the hospital, around 3:45 a.m. She described only one shooter to the detectives: the man who ran up to help the person who was fighting with her husband. Brown said she saw the shooter earlier in the night "in the club throwing singles in the air." She said the shooter was a "[l]ight skinned [B]lack" man. "He had dreads . . . in a ponytail. He had a black . . . hoodie on." Id. She said the shooter was approximately five feet eight inches tall, roughly 170 pounds, and wearing a grill. Brown described the shooter's handgun as "short" but "with a long clip." She thought the clip was spray-painted white but was not certain about the color of the gun's body.

Police interviewed other members of Foster and Brown's group at the police station. One friend who was close to the shooting, Wyatt Percell, described a single shooter who was a Latino male wearing a white shirt, a description that matched Wilson. Another friend described a single shooter who was a "Black male in his mid to late 20s, approximately five-foot-eight inches tall, 160 pounds," with a "boney, narrow face, [and] exposed teeth." She said the shooter had "a nappy, but thin beard" and was wearing a black T-shirt. She also said that the shooter had "[t]wo French-braided dreads."

After their interviews at the police station, a group of Brown's friends went to meet her at the hospital between the hours of 4:00 a.m. and 6:00 a.m. While the group discussed the shooting, one friend thought she had recognized a member of the group who was throwing money in the bar and began searching for that person on Facebook. She found the person's Facebook profile, which contained a video, recorded that night, of the group that was throwing money inside the bar.

The friends showed Brown the Facebook video. Brown, Percell, and another witness who had described the shooter at the police station all agreed that the shooter, who would later be identified as Donaldson, appeared in the video. The friends then alerted police, who contacted Facebook with a warrant.

The shooting occurred early in the morning on October 29, 2017. On the afternoon of October 31, three detectives visited Brown to administer two photo montages, one for each suspected shooter. Before they administered the montages, Brown told them she had seen the Facebook video. All of the montage photos were from driver's licenses. Donaldson's image was in one of the montages along with five other photos of Black men. Donaldson's photo was the only one in his montage of a person with dreadlocks; the other five men had braided hair The photo montage can be viewed here: https://perma.cc/JX4Q-FEMZ. Donaldson was also the only person in his montage wearing red clothing. Brown could not identify anyone from either montage. But she lingered on Donaldson's photo in his montage, commenting, "'He had dreads,'" and "'[t]he guy in the red looked like him, but he had lighter skin.'" After the detectives left that day, Brown called one of the detectives and sent screenshots from the Facebook video, identifying the shooter in the video. On November 1, 2017, Brown called another detective and asked to see the photo montage with Donaldson again, and the detective refused. Brown then

REPORT AND RECOMMENDATION - 3

said, "'The guy in the dreads with the red is the guy,'" referring to the image of Donaldson in the montage. 15 VRP at 1679; Ex. 29.

Police arrested Wilson and Donaldson in early November 2017. No firearms were recovered during either arrest. One officer asked Donaldson his name. Donaldson responded, "'You've got your prize. Let's go.'" Without further prompting from the officer, he then said, "'Okay. I'm 30. I've done everything I wanted to do.'"

The State charged Donaldson with second degree murder and second degree felony murder of Foster, first degree assault of Brown, and second degree assault of their friend Percell. All of these charges had firearm sentencing enhancements.

The State tried Wilson and Donaldson together in 2019. The jury convicted Wilson but deadlocked on all charges against Donaldson. The trial court declared a mistrial. Donaldson's second trial began in February 2020. After losing several jurors due to complications from the COVID-19 pandemic, Donaldson declined to proceed with 11 jurors and the trial court declared another mistrial.

Before Donaldson's third trial, the State moved to admit the statements Donaldson made when he was arrested under CrR 3.5. The trial court found that Donaldson "made a series of statements despite not being asked any questions" except for his name. It found that Donaldson "stated, 'You got your prize, let's go!' and 'I'm thirty, I've done everything I wanted to do.'" The trial court concluded that the statements Donaldson made during his arrest were admissible because "they were made voluntarily and not in response to questioning or interrogation."

Donaldson initially moved to exclude any rap music videos or still photos from those videos as irrelevant under ER 403 and as ER 404(b) evidence of prior bad acts. The trial court indicated that the music videos and still photos from them would likely be admissible for specific purposes, such as establishing a relationship between Wilson and Donaldson, but it did not make a final ruling.

At trial, Brown testified that she watched Foster and Wilson get in a fistfight and that Foster knocked Wilson to the ground. Wilson got up and was reaching for a gun when a second man "came out of nowhere and just start[ed] shooting [Foster], and then they both started shooting [Foster]." She then identified Donaldson in the courtroom as the shooter who ran up on the fight. Defense counsel did not object to Brown's in-court identification of Donaldson as the shooter. Brown also explained that she saw Wilson and Donaldson earlier that night with the group throwing money inside the bar.

When the State moved to admit the photo montage that included Donaldson, defense counsel objected, arguing that the montage was inadmissible under ER 403. Defense counsel asserted that Brown could not initially identify the shooter from the montage, so admitting the evidence would be "suggestive," confusing, and misleading. The trial court overruled the objection and admitted the photo montage and Brown's testimony about her identification of Donaldson from the montage.

REPORT AND RECOMMENDATION - 4

One of the detectives who administered the montage testified that there is "often a problem with montages if you use driver's license photos" because the subject's skin tone can appear different than in real life.

On cross-examination, defense counsel elicited testimony that Brown saw the Facebook video before she identified Donaldson from the photo montage. And while cross-examining another detective who administered the photo montage, defense counsel questioned the value of Brown's identification, asking if the montage was "unduly suggestive" because it was "obvious" that Donaldson was the only person in the montage with dreadlocks.

During trial, Brown addressed the fact that she had been inconsistent in remembering whether or not Wilson fired a gun. She said she remembered Wilson shooting after undergoing eye movement desensitization and reprocessing (EMDR) therapy in the months following the shooting.

EMDR therapy "requires the clinician to move a finger back and forth across the patient's field of vision . . . while the patient considers a selected unsettling image related to a traumatic experience." The therapy reduces the emotional response of a memory so the recollection becomes "'a flashbulb memory, a picture with . . . just a feeling of sadness and a sense of loss,'" instead of a trigger for posttraumatic stress.

Brown testified that the therapy "[brought her] back to the scene of everything that happened" and allowed her to "remember more," as well as healing the traumatized part of her brain.

At a break, defense counsel requested a one-month continuance to research EMDR therapy, arguing that the State had committed a discovery violation by not telling counsel that Brown "was in memory improvement therapy . . . designed to recall details of the event." The State responded that EMDR was intended as a trauma therapy, that no one had ever asked Brown if she had gone through trauma therapy, and that "[i]t is not a discovery violation simply because no one has ever asked." The trial court stated, "I don't know what the significance of any of this is," but reasoned that the therapy "was not necessarily supposed to be a memory enhancement" as much as "a way to cope with trauma." And it concluded that there was not "any discovery violation or misconduct from the prosecutor since it appears that . . . they were as surprised by this as anybody." The trial court denied the motion for a continuance. Defense counsel then requested a recess for the remainder of the morning "to study up" before continuing cross-examination in the afternoon. The trial court also denied that request.

On cross-examination, Brown testified that she did not know what the acronym EMDR stood for, how the therapy worked, or whether the therapy was intended to help with "trauma coping as opposed to recreating memories."

REPORT AND RECOMMENDATION - 5

Surveillance videos of the shooting admitted at trial showed at least seven muzzle flashes associated with two different people. The State's video expert testified that because the surveillance cameras recorded only 30 frames per second, additional muzzle flashes could have occurred without being captured on the video. Identifying the shooters from the surveillance video was difficult due to the poor lighting, low resolution of the video, and distance of the camera from the shooting.

One of the witnesses who had previously described Donaldson to police testified about what she saw during the shooting. The witness said that when the shooting was happening, she was close enough to reach out and touch the one shooter she saw. She explained that after the shooting, when she was at the hospital, she watched the Facebook video and recognized Donaldson as the shooter. She then identified Donaldson as the shooter in the courtroom.

The trial court also admitted a transcript of the testimony of another of Brown's friends, who testified in the first trial but was found to be unavailable for the third. In the first trial, the friend said that before the shooting, she saw Foster get into a fight with a man who "looked Hispanic," was "extremely light skinned," and was "definitely shorter than Foster." She described seeing only one shooter but hearing a pattern of gunfire that made her "assume that there was more than one person shooting." The shooter she saw was a medium-skinned Black man with dreadlocks, but she could not recall the length of the dreadlocks or if they were tied back.

Percell, the victim of the second degree assault charge, also testified. Although other witnesses testified that he had previously identified Donaldson as a shooter, Percell, who suffered posttraumatic stress after the shooting, could not identify the shooter in the courtroom and did not recall identifying Donaldson as a shooter.

Defense witnesses testified that they saw Wilson shoot, but not Donaldson. One witness testified that Donaldson was the only person in his group in the bar with dreadlocks. One witness identified a "light-skinned" shooter and said Donaldson was not near the shooting. Another defense witness who arrived at the bar with Donaldson and Wilson testified that she saw Wilson fire a gun before she turned and ran from the scene. She initially testified that Donaldson did not have anything to do with the shooting. The State then impeached her with her prior testimony that she saw Donaldson "r[u]n towards the tussle" of Wilson and Foster immediately before the shooting.

The State moved to admit several still images from a music video Donaldson appeared in. The video was posted online three days before the shooting. The images showed Donaldson holding what appeared to be a Glock handgun with an extended magazine, the kind of gun and magazine used in the shooting. The video had a disclaimer at the end stating that all of the guns in the video were props. The trial court ruled that the still images of Donaldson were relevant to show that he had access to that kind of gun.

REPORT AND RECOMMENDATION - 6

After the trial court's ruling, Donaldson moved to admit the entire music video without sound, including the disclaimer, under the rule of completeness. The trial court ruled that most of the video was admissible, but excluded the disclaimer as hearsay. It does not appear from our record that the video was ever played for the jury.

The State later offered and the trial court admitted several more still images from music videos Donaldson appeared in over defense counsel's ER 403 and 404(b) objections. Two stills showed the outfit Donaldson wore for a video and a third showed someone with the same clothing holding a gun with an extended magazine. Another image showed someone taking the magazine out of a gun. Other images showed the car Donaldson was alleged to have left the crime scene in, Donaldson wearing a gold grille, and Donaldson and Wilson standing next to each other or appearing in each other's videos.

The State's firearm expert testified that the 9 millimeter casings at the crime scene were likely fired from a Glock. The State then showed the expert witness the music video images of the gun. The expert explained that Donaldson was holding something "visually consistent [with] a Glock firearm" in the images but could not identify the caliber or "say with any certainty" whether the gun or ammunition in the images was real.

The jury instructions provided the law of accomplice liability, explaining that a person is an accomplice to a crime "if, with knowledge that it will promote or facilitate the commission of the crime," they encourage or ask another person to commit the crime or "aid[] or agree[] to aid another person in planning or committing the crime." The instructions stated that "'aid'" includes "words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by [their] presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown."

In closing arguments, the prosecutor summarized the concept of accomplice liability. The prosecutor explained, "[W]hen you knowingly assist someone in the commission of a crime, you are responsible, not only for your actions, but you're responsible legally for the actions of the person you are assisting." "And so . . . when the defendant runs up to provide aid to Marshall Wilson, the defendant is not only responsible for his gun and his bullets; he's responsible for Marshall Wilson's gun and Marshall Wilson's bullets as well." Defense counsel did not object to this explanation.

Later, the prosecutor applied the principle to the facts of the case, explaining that although one of the bullets removed from Foster was a 9 millimeter, the caliber of the bullet that killed Foster by piercing his lung and heart was unknown: "This gets back to the idea of accomplice liability. Regardless of whose bullet it was that killed [Foster], you are responsible, not only for your bullets, but [for] those of your accomplices." Again, defense counsel did not object.

REPORT AND RECOMMENDATION - 7

The prosecutor also summarized the evidence in the case, including the statements Donaldson made when arrested:

He is arrested, and this isn't some small-time arrest. . . . This is a massive— officer, SWAT included [operation], that are arresting the defendant, taking him to Tacoma patrol cars with Tacoma officers in uniform for a murder that happened eight days earlier. He knows exactly what this is about. And what is his response? His response is not something like "you've got the wrong guy" or "what's this about" or "I didn't do this." His response is nothing like you would expect from someone who didn't do it. His response is one of absolute defiance and just indifference, talking about how the officers got their prize. Even more importantly, "It's okay. I did everything I wanted to do. I'm 30. I did everything I wanted to do in my life." That's his statement. You are being arrested for murder. You are being arrested for gunning down a 22-year-old, and your statement is "It's okay. I did everything I wanted to do in my life anyway." It's really a callous statement because [Foster] didn't get to do everything in his life that he wants to do. More than that, it gives a window into his mindset. These are not the words of someone who didn't do it.

Defense counsel did not object to these comments.

In defense closing arguments, counsel attacked Brown's credibility while emphasizing the credibility of witnesses who described seeing only Wilson fire a gun. In rebuttal, the State commented that counsel "didn't have one way of explaining away his client's statements when he was arrested."

The jury convicted Donaldson of all charges and found that he was armed with a firearm during all the offenses.

At sentencing, the trial court ruled that the second degree felony murder conviction merged with the second degree murder conviction. The trial court imposed a sentence at the high end of the standard sentencing range for the second degree murder and the low end of the standard sentencing range for the first degree assault. After the firearm sentencing enhancements, the total sentence imposed was 514 month[s].

Donaldson appealed and filed a CrR 7.8 motion that was transferred to this court as a timely PRP, which we consolidated. The PRP includes a declaration from Dr. Henry Otgaar explaining that EMDR can amplify the formation of false memories. But Otgaar also admits that he "do[es] not have enough information" to form an opinion on whether "Brown's receipt of EMDR actually did cause the creation of any false memories such that her testimony regarding her husband's death was inaccurate."

Dkt. 10, Ex. 22 at 3–15 (headers and internal citations omitted).

REPORT AND RECOMMENDATION - 8

B. Procedural Background

1. *Direct Appeal and Personal Restraint Petition*

After sentencing, Petitioner filed a timely notice of appeal to the state court of appeals. Dkt. 1, Ex. F. On December 21, 2021, the state court of appeals reversed Petitioner's conviction because of prosecutorial misconduct for misstating the law. Dkt. 1, Ex. F. On remand, Petitioner pled guilty to manslaughter in the second degree and was sentenced to 99 months of imprisonment. Dkt. 1, Ex. G.

On June 17, 2022, Petitioner filed a timely motion for relief from judgment under CrR 7.8(b) concerning the fact that a key witness at trial—Olivia Brown—received Eye Movement Desensitization Reprocessing ("EMDR") therapy after the shooting. Dkt. 10, Ex. 10. Three weeks later, the trial court transferred Petitioner's motion for relief from judgment to the state court of appeals to be considered as a personal restraint petition ("PRP"). Dkt. 10, Ex. 11. On July 21, 2022, Petitioner filed a motion to consolidate his direct appeal with his PRP, which the state court of appeals granted. The state court of appeals affirmed Petitioner's conviction and denied his PRP. Dkt. 10, Ex. 22. Petitioner filed a motion for reconsideration, which the state court of appeals denied. Dkt. 10, Exs. 23, 24. Petitioner then sought discretionary review from the Washington Supreme Court ("state supreme court"). Dkt. 10, Ex. 25. The state supreme court denied the petition for review without comment, and the state court of appeals issued the mandate on June 6, 2024. Dkt. 10, Exs. 28, 29.

2. *Federal Petition*

On April 23, 2025, Petitioner initiated this case. Dkt. 1. In his Petition, the Court considers the grounds raised for relief as the following:

1.  The use of a suggestive police photo montage raised a substantial likelihood of prejudice in violation of the Fourteenth Amendment as follows:

REPORT AND RECOMMENDATION - 9

    a. The use of the impermissibly suggestive montage could not be cured by a subsequent viewing of Petitioner.

    b. Consideration of a witness's opportunity to view Petitioner approximately an hour before the crime instead of viewing the shooter "'at the time of the crime'" is contrary to established federal law.

    c. The trial court's consideration of corroborative evidence of a witness's identification of Petitioner as the shooter was contrary to Supreme Court precedent holding that corroborative evidence may not be considered when deciding whether a suggestive police identification procedure was prejudicial.

    d. The trial court did not consider a key witness's certainty when she was shown the suggestive montage. *Id.* at 11–12.

2. Petitioner was denied effective assistance of counsel in violation of the Sixth Amendment when the trial court precluded Petitioner's trial counsel from discovering what EMDR therapy was, how it was conducted on a key witness, and how it affected the witness's memory. *Id.* at 12.

3. The trial court preventing Petitioner's counsel from cross-examining a key witness on how EMDR therapy affected her memory and her identification of Petitioner as one of the shooters was in violation of the Sixth Amendment Confrontation Clause. *Id.* at 12–13.

4. The trial court violated Petitioner's right to present a defense when it denied Petitioner's trial counsel the opportunity to find and confer with an expert who had knowledge of EMDR therapy. *Id.* at 13.

5. Petitioner's right to remain silent under the Fifth Amendment was violated when the prosecutor at trial argued that Petitioner failed to say, "'I didn't do this'" or "'you've got the wrong guy.'" *Id.*

6. Petitioner's right to due process under the Fourteenth Amendment and his Fifth Amendment right to remain silent were violated at the prosecutor's closing argument inviting the jury to read into Petitioner's silence when he did not attempt to tell the arresting officer he did not commit a crime. *Id.*

Petitioner filed a Brief in Support of the Petition. Dkt. 2. On August 15, 2025, Respondent served on Petitioner an Answer to the Petition. Dkts. 9, 10 (state court record). In the Answer, Respondent asserts that the state court of appeals' adjudication of the grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 9. Petitioner contests Respondent's arguments in the Traverse. Dkt. 15. Finally, Respondent filed a Reply. Dkt. 18. Thus, this case is ripe for review.

REPORT AND RECOMMENDATION - 10

## II.    Discussion

Respondent maintains that the state court of appeals' adjudication of the grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 9.

### A. Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

REPORT AND RECOMMENDATION - 11

where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

B.  Photo Montage (Ground 1)

Ground 1, and all its subparts, involves a single question: can Brown's identification of Petitioner as the shooter be considered reliable considering the totality of the circumstances, even if she participated in a suggestive photo montage? The parties disagree on the answer to this question. The Court agrees with Respondent that the state court of appeals reasonably applied Supreme Court precedent when it held that Brown's identification was reliable under the totality of the circumstances. *See* Dkt. 10, Ex. 22 at 21.

Suggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identification and thereby deny a defendant due process of law. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984). To determine whether a challenged identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification, the court must examine the totality of the surrounding circumstances. *U.S. v. Bagley*, 772 F.2d 482 (1985).

If the court finds that a challenged procedure is not impermissibly suggestive, the inquiry into the due process claim ends. *See United States v. Davenport*, 753 F.2d 1460, 1463 (9th Cir.

REPORT AND RECOMMENDATION - 12

1985). If, however, a pretrial procedure is found to be impermissibly suggestive, automatic exclusion of identification testimony is not required. *See Manson v. Brathwaite*, 432 U.S. 98, 113–14 (1972); *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972). If under the totality of the circumstances the identification is sufficiently reliable, identification testimony may be properly allowed into evidence even if the identification was made pursuant to an unnecessarily suggestive procedure.

To determine whether the identification was sufficiently reliable to warrant admission, the court must weigh the indicia of reliability against the "corrupting effect of the suggestive identification procedure itself." *Brathwaite*, 432 U.S. at 114. Several factors which should be considered in evaluating the reliability of both in-court and out-of-court identifications are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200.

The state court of appeals held that Brown's identification of Petitioner as the shooter was reliable under the totality of the circumstances, even if she saw an impermissibly suggestive photo montage:

> Donaldson first argues that the photo montage procedure was impermissibly suggestive. He contends that his photo was the only one in the montage that matched Brown's earlier descriptions to police of a Black man with dreadlocks. And he asserts that, because the detectives administering the montage knew Donaldson was a suspect, the lack of a double-blind procedure further impacted the montage's suggestibility. We agree that having only one person in the montage with a distinctive hairstyle that matched the witness's earlier descriptions rendered the montage impermissibly suggestive. A photo montage is impermissibly suggestive if it "directs undue attention to a particular photo." *State v. Eacret*, 94 Wn. App. 282, 283, 971 P.2d 109 (1999). Generally, a photo montage will be impermissibly suggestive "when the defendant is the only possible choice given the witness's earlier description." *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002).

REPORT AND RECOMMENDATION - 13

For example, courts have found montages impermissibly suggestive when witnesses described distinctive characteristics and the defendants were the only people in the montages with those characteristics. *Derri*, 199 Wn.2d at 678. See *State v. Kinard*, 109 Wn. App. 428, 431, 433, 36 P.3d 573 (2001) (defendant only person in photo montage with tooth gap); *State v. Burrell*, 28 Wn. App. 606, 611, 625 P.2d 726 (1981) (defendant only person in photo montage with "frizzy Afro" hairstyle).

Here, Donaldson was the "only possible choice" in the photo montage after Brown's preliminary descriptions to police of a light-skinned Black man with shoulder-length dreadlocks. *Ramires*, 109 Wn. App. at 761. Other witnesses described a shooter with braids, but Brown only ever described dreadlocks to police. And the lack of a double-blind procedure was another factor weighing in favor of suggestiveness. We hold that the montage was impermissibly suggestive. We must then examine the reliability of Brown's identification under the totality of the circumstances. *Derri*, 199 Wn.2d at 673.

Donaldson argues the identification was unreliable because the shooting happened quickly and at night, Brown was injured during the shooting, and she initially did not identify the shooter from the montage. He also reasons that Brown received cowitness suggestion when her friends showed Brown the Facebook video of Donaldson at the bar that same night. And he asserts that the EMDR therapy Brown underwent before trial potentially created false memories. We disagree.

The State argues that "Donaldson did not develop [a clear record on] whether there was any cowitness suggestion" from Brown's viewing of the Facebook video, so "[t]he lack of a record prevents review." Br. of Resp't at 53-54. But counsel cross-examined the detectives and Brown about the reliability of her identification, developing a sufficient record.

Courts use several factors in assessing the reliability of an identification. *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). We consider the witness's opportunity to view the defendant at the time of the crime, the witness's degree of attention, the accuracy of the witness's descriptions, the level of certainty demonstrated at the procedure, and the length of time between the crime and the identification. *Derri*, 199 Wn.2d at 674. We also consider other variables that can affect reliability, such as cowitness suggestion. *Id.* at 689. Where the identification's "'aspects of reliability' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Id.* at 674-75 (quoting *Brathwaite*, 432 U.S. at 116).

In *Derri*, the Washington Supreme Court held that three bank employee witnesses' identifications of a robber were reliable despite a suggestive police procedure tainted by "the failure to employ a double-blind procedure, multiple exposures to the same suspect, and use of a single suspect showup." *Id.* at 685. First, two of the three witnesses interacted with the robber several weeks before the crime and told police they recognized him from that interaction. *Id.* at 686. Despite the stress of

REPORT AND RECOMMENDATION - 14

witnessing the robbery, "the witnesses were all able to provide a detailed description of the robber's appearance, including facial features, height, clothing, and voice, and no witness reported a visible weapon." *Id.* at 687. And two of the witnesses identified the robber within a day of the crime, while the third identified him nine days after the robbery. *Id.* at 689. The *Derri* court assigned limited weight to the fact that all three witnesses described the robber with characteristics that were consistent with the defendant's appearance and to the witnesses' high level of certainty in their identifications. *Id.* at 687-88. Overall, the Supreme Court held that the corrupting effect of the suggestive procedure did not "outweigh the additional indicia of reliability present with regard to each witness." *Id.* at 690.

Donaldson drew Brown's attention earlier in the night inside the bar because his group was throwing money in the air. She gave police consistent and accurate descriptions of Donaldson three times within a few hours of the shooting, before she saw the Facebook video. She consistently described the shooter as a light-skinned Black man with dreadlocks pulled into a ponytail, wearing a grille in his mouth and a black hoodie. Brown's descriptions were consistent with those other witnesses gave.

Brown also told police that she recognized Donaldson from the group throwing money inside the club before she saw the Facebook video. She identified Donaldson in the Facebook video for police in addition to identifying him in the photo montage. And a defense witness testified that Donaldson was the only person in his group with dreadlocks. Additionally, Brown identified Donaldson from the photo montage three days after the shooting. Her primary concern with his photo in the montage was a difference in skin tone between the person she observed in the bar and parking lot versus his driver's license photo, which a detective noted was a common concern in montages of driver's license photos.

Given Brown's opportunity to view the man who would be the shooter before the crime at a time when she was not experiencing stress, as well as the consistency and accuracy of her description before viewing the Facebook video, and her identification of Donaldson as one of the people throwing money in the bar and then her identification in the Facebook video separate from the photo montage, we conclude that her identification was reliable under the totality of the circumstances. The fact that Brown later underwent therapy that may have affected her memory does not affect the reliability of her pretherapy identifications.

Although the photo montage was impermissibly suggestive because Donaldson was the only person in the montage with dreadlocks, we hold that Brown's identification was sufficiently reliable under the totality of the circumstances. Thus, the admission of the montage identification was not a manifest error affecting a constitutional right that requires reversal.

Dkt. 10, Ex. 22 at 17–21 (headers and footnotes omitted).

REPORT AND RECOMMENDATION - 15

Though the state court of appeals held that the photo montage with Petitioner as the only person in the lineup with dreadlocks was impermissibly suggestive, Brown's identification of Petitioner as the shooter was "sufficiently reliable under the totality of the circumstances." *Id.* at 21. In its analysis, the state court of appeals listed the *Biggers* factors and reasonably applied some of them to the facts of the case. For example, Brown consistently identified Petitioner. She gave law enforcement accurate descriptions of Petitioner three times within a few hours of the shooting, describing the shooter as "a light-skinned Black man with dreadlocks pulled into a ponytail, wearing a grille in his mouth and a black hoodie." *Id.* at 20.

The state court of appeals identified the correct governing federal precedent and reasonably applied it to the facts. *See Williams v. Taylor*, 529 U.S. 362, 389 (2000). Consequently, the state court of appeals' decision was neither contrary to, nor an unreasonable application of, clearly established federal precedent.

Petitioner, however, raises several arguments that the state court of appeals misapplied *Brathwaite* and *Biggers.* Dkt. 15 at 7–21. He first argues that the state court of appeals misapplied *Brathwaite* when it considered evidence of identifications made by other witnesses. *Id.* at 7–11. While the state court of appeals did state that "Brown's descriptions were consistent with those other witnesses gave," it still considered the totality of the circumstances when assessing the reliability of her identification of Petitioner as the shooter.

Second, Petitioner contends that the state court of appeals misapplied *Biggers* because it neither considered Brown's opportunity to view Petitioner "at the time of the crime," nor did it consider Brown's level of certainty when she identified Petitioner as the shooter. *Id.* at 14–21. The Court in *Biggers*, however, never held that a reviewing court must analyze all the factors it set forth in that case. It specifically stated that the factors in *Biggers* serve as guides to determine

REPORT AND RECOMMENDATION - 16

"whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199; *Davis v. Smith*, 145 S. Ct. 93, 96 (2025). Therefore, the Supreme Court has never identified that courts must analyze all the *Biggers'* factors when analyzing a suggestive police procedure. And without a Supreme Court decision that "squarely establishe[s]" the "specific legal rule" that Petitioner invokes, the state court of appeals' decision could not have involved "an unreasonable application of clearly established Federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Finally, Petitioner's arguments here can also be construed as stating that the state court of appeals largely failed to apply two of the *Biggers* factors. But state courts do not need to explain their reasoning at all in their disposition of habeas petitions because federal courts "have no authority to impose mandatory opinion-writing standards on state courts." *See Johnson v. Williams*, 568 U.S. 289, 300 (2013); *see also Harrington*, 562 U.S. at 98 ("There is no text in [§§ 2254(d)(1)-(d)(2)] requiring a statement of reasons."). Here, though, the state court of appeals cited and quoted directly from *Biggers*, listed its factors, and assessed the right legal question— whether Brown's identification was reliable under the totality of the circumstances. Thus, the state court of appeals' analysis of the suggestive photo montage and the totality of the circumstances surrounding Brown's identification of Petitioner satisfies AEDPA's highly deferential standard of review.

Accordingly, the Court recommends that Ground 1 be denied.

C.  Ineffective Assistance of Counsel (Ground 2)

In Ground 2, Petitioner alleges he received ineffective assistance of counsel because the trial court prevented defense counsel from discovering the nature of EMDR therapy and its effects on Brown's memory. Dkt. 1 at 12. He further argues the trial court denied defense

counsel the "opportunity to prepare for cross-examination of the State's key witness on these subjects because [Brown] did not reveal the fact that she had received such therapy until she was on the witness stand." *Id.*

A standard claim of ineffective assistance of counsel generally proceeds under the two-part test the Supreme Court created in *Strickland v. Washington*. 466 U.S. 668 (1984). In that hallmark case, the Supreme Court held that a defendant must first demonstrate his attorney's performance was deficient, which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. And, second, a defendant must demonstrate the deficient performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

Ground 2 in the Petition is not an ineffective assistance of counsel claim. As Respondent points out, Ground 2 fails because it does not claim that Petitioner's trial counsel was deficient; it claims that the trial court violated Petitioner's rights under the Sixth Amendment when it prevented defense counsel from discovering the nature of EMDR therapy and its effects on Brown's memory. *See* Dkt. 9 at 28 (citing *Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015). Even though Petitioner concedes that his trial counsel's performance in this Ground was not deficient, he attempts to transform Ground 2 to a due process violation. Dkt. 2 at 118; Dkt. 15 at 25–27. He claims that, under *Ungar v. Sarafite*, 376 U.S. 575 (1964), the denial of a continuance "**can** be a due process violation." Dkt. 15 at 26 (emphasis in original).

Petitioner is correct that *Ungar* stands for the proposition that the refusal of a continuance might violate an individual's due process rights, but it does not mean that a Sixth Amendment right to counsel violation occurred. Notably, Petitioner frames this Ground in the Petition solely in terms of his Sixth Amendment right to counsel, not his due process rights. *See* Dkt. 1 at 12 ¶

REPORT AND RECOMMENDATION - 18

7.2. Petitioner's attempts to construe this Ground in the briefing as a due process violation cannot change the fact the Petitioner raised it as an ineffective assistance of counsel claim under the Sixth Amendment. The particularized facts which entitle a petitioner to habeas relief "must consist of sufficient detail to enable the court to determine, *from the face of the petition alone*, whether the petition merits further habeas corpus review. *See Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) (emphasis added). To the extent Petitioner attempted to construe Ground 2 as a due process violation in the Brief in Support (Dkt. 2) the Court recommends this additional ground be denied as improperly pled.

And because Petitioner concedes that his counsel performed diligently when he immediately requested a continuance or recess upon learning that Brown had undergone EMDR therapy, he cannot claim that his counsel was ineffective under the Sixth Amendment. *See* Dkt. 2 at 118 ("There cannot be any dispute about defense counsel's diligence in acting in a timely manner.").

Therefore, the Court recommends that Ground 2 be denied.

D.  Right to Confront (Ground 3)

In Ground 3, Petitioner contends his Confrontation Clause rights were violated when he was not allowed to cross-examine Brown about her EMDR therapy and how it may have affected her memory when she identified Petitioner as one of the shooters. Dkt. 1 at 12–13.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him." U.S. Const. Amend. VI. The Confrontation Clause applies to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it guarantees criminal defendants the right to confront and cross-examine the witnesses against them. *Chambers*, 410

U.S. at 294–95. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). This right includes the right to cross-examine adverse witnesses to attack their general credibility or show their possible bias or self-interest in testifying. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988).

Despite this constitutional guarantee, trial judges retain wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v Van Arsdall*, 475 U.S. 673, 679 (1986). A trial court's restrictions on the defendant's right to cross-examine witnesses may not be "arbitrary or disproportionate to the purposes they are designed to serve" and may not prohibit all inquiry into the possibility that a witness is biased. *Ortiz v. Yates*, 704 F.3d 1026, 1034, 1035 (9th Cir. 2012) (quotations omitted) (citing *Michigan v. Lucas*, 500 U.S. 145, 151 (1991)). Generally, the Confrontation Clause is satisfied when the defendant has the opportunity to show the weaknesses in a witness's testimony and undermine a witness's credibility. *Hayes v. Ayers*, 632 F.3d 500, 518 (9th Cir. 2011) (citations omitted) ("No Confrontation Clause violation occurs as long as the jury receives sufficient information to appraise the biases and motivations of the witness.").

In determining Petitioner's Sixth Amendment rights were not violated, the state court of appeals stated:

> In addition to the pretrial identification, Brown also identified Donaldson as the shooter in the courtroom at Donaldson's third trial. When testifying that she also remembered Wilson firing a gun, Brown said for the first time that her memory had been affected by undergoing EMDR therapy in the months after the shooting. Donaldson then moved for a one month continuance to research EMDR therapy and its effects on Brown's testimony, which the trial court denied. The trial court also denied a request to recess for the remainder of the morning so defense counsel could "study up" on EMDR. 12 VRP at 1196.

REPORT AND RECOMMENDATION - 20

In his PRP, Donaldson argues the trial court abused its discretion by denying his first motion for a month-long continuance and his second motion for a morning recess. Even though "it is undisputed" that "Brown made several statements to police regarding the shooting before [she started] EMDR therapy," Donaldson contends that the therapy impacted Brown's trial testimony and in-court identification of Donaldson. PRP at 24. He insists that this denied him his right to due process, right to present a defense, right to confront and cross-examine Brown's therapist, and right to effective assistance of counsel.

Donaldson compares EMDR therapy to hypnosis and reasons that the trial court should have excluded "'testimony dependent upon memory that has been enhanced or recovered through EMDR'" until it could determine the reliability of the testimony under the totality of the circumstances. PRP at 32 (quoting *United States v. D.W.B.*, 74 M.J. 630, 642 (N-M. Ct. Crim. App. 2015) (case from the Navy-Marine Court of Criminal Appeals addressing the admissibility of memories recovered through EMDR therapy). Donaldson asserts that the failure to do so "denied him a chance to investigate the surprise testimony about memory distorting therapy of the State's key witness." Appellant's Consol. Reply Br. at 28. Donaldson contends that we must remand for an evidentiary hearing to determine whether he was prejudiced by the lack of evidence that EMDR therapy can create false memories. PRP at 26-29. "To the extent" that his expert "lacks necessary details to fully assess the reliability of Brown's testimony, so did the trial court." Appellant's Consol. Reply Br. at 30.

Even assuming the trial court should have granted a recess to allow Donaldson's counsel time to prepare for cross-examination in light of Brown's discussion of EMDR therapy on direct, this error was not prejudicial. We otherwise disagree with Donaldson's arguments in his PRP.

A personal restraint petitioner claiming constitutional error must demonstrate that they were actually and substantially prejudiced as a result of that error. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016). To demonstrate actual and substantial prejudice, the petitioner must show that the outcome of the proceeding "would more likely than not have been different had the error not occurred." *State v. Buckman*, 190 Wn.2d 51, 60, 409 P.3d 193 (2018).

The parties cite no Washington case that has addressed the admissibility of testimony potentially affected by EMDR therapy. And there is not consistent caselaw on the closest analogy, testimony about facts recalled during hypnosis. The Ninth Circuit has long held that hypnotically refreshed memories are admissible. *United States v. Awkard*, 597 F.2d 667, 669 (9th Cir. 1979) ("The fact of hypnosis, if disclosed to the jury, may affect the credibility of evidence, but not its admissibility."). In contrast, Washington has barred the admission of testimony "concerning information recalled while under hypnosis," although testimony about "facts recalled prior to hypnosis" remains admissible. *State v. Martin*, 101 Wn.2d 713, 722, 684 P.2d 651 (1984).

REPORT AND RECOMMENDATION - 21

The military case Donaldson relies on lists multiple factors to consider in assessing the reliability of post-EMDR testimony, including whether the procedure was "used as a criminal investigative aid, intended to recover memories, or . . . a therapeutic procedure. There is a greater danger of suggestibility in the former two, while there is a lesser danger in the last." *D.W.B.*, 74 M.J. at 643. Courts also consider "[w]hether independent corroborating evidence exists to support the reliability of the recovered memories." *Id.* The remaining factors address the qualifications of the therapist, suggestive circumstances of the therapy, and evidence about the reliability of the procedure. *Id.*

First, even assuming without deciding that Brown created false memories during her EMDR therapy, the affected memories were primarily related to whether Wilson was a shooter. Donaldson asserts that the change in Brown's memories affected the defense's theory that there was only one shooter: Wilson. But the record shows that Brown identified two shooters to police at the hospital shortly after the shooting and months before she underwent EMDR therapy. Brown described a "possibly Hispanic male" right next to Foster, and then a Black male "who ran up behind later" with dreadlocks and a gold grille. 9 VRP at 862-63. To the extent that the EMDR therapy may have affected Brown's memory, Brown repeatedly described a shooter who ran towards the fight, and she identified Donaldson as that shooter before she underwent the therapy. She never wavered in her assertions to police that the person who ran up on the fight, later identified as Donaldson, shot at her husband. The sole inconsistency between her accounts pre and post therapy was whether or not she remembered Wilson pulling out and firing a gun.

Additionally, Brown's testimony was consistent with her descriptions of Donaldson's appearance and actions that she gave immediately after the shooting, and independent corroborating evidence from other witnesses supports her identification. *See D.W.B.*, 74 M.J. at 643. A friend who described Donaldson the night of the shooting also testified that Donaldson was the shooter, and there was testimony that Percell had previously identified Donaldson as the shooter, although he was unable to do so at the time of trial. Donaldson was the only person in his group with identifiable dreadlocks, and a witness who knew him testified that he ran towards the fistfight immediately before the shooting. Finally, the therapy was therapeutic, a factor the *D.W.B.* court considered to be relevant. *Id.* Thus, Donaldson has not shown that Brown's in-court identification of Donaldson was made unreliable by her EMDR therapy.

Even assuming that the trial court erred by denying the recess to prepare for cross examination in light of Brown's new testimony about her EMDR therapy, Donaldson cannot show prejudice. As explained above, Brown did not waver in her statements that the person who ran up on the fight shot at her husband. Brown's pre-EMDR statements and identifications of Donaldson were admissible, and she described two shooters to police the night of the shooting. Donaldson's expert has not said that the EMDR therapy Brown received actually affected her testimony, and Donaldson cannot show a substantial probability that he would have been

REPORT AND RECOMMENDATION - 22

acquitted without Brown's in-court identification. Donaldson primarily argued below that it was prejudicial that Brown identified two shooters after undergoing EMDR therapy, but there was already objective evidence of two shooters in addition to Brown's pre-EMDR recollection of two shooters. Surveillance video showed muzzle flashes associated with two different people, two types of shell casings were recovered from the scene, witnesses reported hearing two guns firing, and different witnesses described one shooter who matched Wilson's description and one who matched Donaldson. Therefore, any error in denying the motions for a continuance or recess was harmless. Because Donaldson cannot show actual and substantial prejudice arising from the alleged error, we deny Donaldson's PRP.

Dkt. 10, Ex. 22 at 23–25.

At trial, after the trial court denied defense counsel's motion for a continuance to gather information about EMDR therapy, defense counsel extensively cross-examined Brown regarding her EMDR therapy. Dkt. 10, Ex. 41 at 32–43. During defense counsel's examination of Brown, he asked her about the nature of the EMDR therapy, how long she underwent it, the credentials of the therapists, and if she was still in therapy. *Id.*

As in Ground 2, Petitioner's claim in Ground 3, on its face, shows that his claim is meritless, regardless of the plethora of arguments he raises in the briefing. In Ground 3, Petitioner states that his right to confront Brown was violated because she "had no idea how EMDR worked or what it was and could only describe it as a form of 'brain stimulation.'" Dkt. 1 at 12–13. This argument stretches the bounds of a claim under the Confrontation Clause. The record before the Court shows that Petitioner's defense counsel at trial took the opportunity to examine Brown thoroughly after she admitted to undergoing EMDR therapy. Dkt. 10, Ex. 41 at 32–43. Brown's examination satisfies the Confrontation Clause because defense counsel had the opportunity to show the weaknesses in Brown's testimony and undermine her credibility regarding her receiving EMDR therapy. *Hayes*, 632 F.3d at 518. Therefore, the state court of appeals rejection of his Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established federal law when it found that defense counsel had the

REPORT AND RECOMMENDATION - 23

opportunity to cross-examine Brown, even if defense counsel did not have time to prepare for it. Dkt. 10, Ex. 21 at 24–25.

In addition, because the Supreme Court has not squarely addressed the admissibility of testimony from witnesses who received EMDR therapy, the state court of appeals' rejection of Petitioner's claim cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Smith v. Small*, 697 Fed. App'x 538, 539 (9th Cir. 2017) (finding that a state appellate court's ruling affirming trial court's exclusion of proposed defense witnesses was not contrary to clearly established federal law because the Supreme Court has not squarely addressed the constitutionality of the discretionary exclusion of evidence).

For these reasons, Petitioner fails to show the state court of appeals' conclusion that his Sixth Amendment rights were not violated was contrary to, or was an unreasonable application of, clearly established federal law.

Accordingly, the Court recommends Ground 3 be denied.

E.   Present a Defense (Ground 4)

In Ground 4, Petitioner states that he was denied his Sixth Amendment right to present a defense when the trial court denied defense counsel the "opportunity to consult with an expert who had knowledge of what EMDR was, how it worked, and the danger it posed of generating false memories." Dkt. 1 at 13. He claims that the opportunity to obtain expert services with knowledge of EMDR therapy was necessary to exclude or impeach Brown. *Id.*

The Constitution guarantees a criminal defendant a meaningful opportunity to present relevant evidence in his own defense at trial. *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Criminal defendants have the right "to present and have considered by the jury all relevant evidence to rebut the State's evidence on all

REPORT AND RECOMMENDATION - 24

elements of the offense charged." *Montana v. Egelhoff*, 518 U.S. 37, 41 (1996). The right to present a defense is, however, not absolute. *Id.* at 42. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id.* (citing *Taylor*, 484 U.S. at 410). A state court's decision to exclude evidence "must be so prejudicial as to jeopardize the defendant's due process rights." *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990).

This Court already included the state court of appeals' analysis of Petitioner's claim regarding the trial court's denial of defense counsel's continuance to obtain expert services on EMDR therapy. *See* Part II., D.

Petitioner's claim regarding the denial of the continuance to obtain expert services is not based on clearly established federal law because the Supreme Court has not held a defendant is entitled to the type of expert Petitioner planned on seeking if the trial court had granted a continuance. The Supreme Court has held that an indigent defendant in a capital case is entitled to the appointment of a psychiatric expert where the defendant has made a preliminary showing that his sanity is likely to be a significant factor at trial. *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985). The Supreme Court did not hold in *Ake* that a defendant has a right to access such an expert in every case, *see id.* at 82, and the Supreme Court has reserved judgment on whether the Constitution requires the appointment of other types of experts. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985).

Respondent argues that Petitioner does not meet the high threshold set in *Ake* that requires the appointment of experts to comment on an issue at trial. Dkt. 9 at 40–41. Petitioner cannot satisfy the threshold in *Ake* because this is not a death-penalty case.

REPORT AND RECOMMENDATION - 25

In his Brief in Support, Petitioner states that only one appellate court—the United States Navy-Marine Corps Court of Criminal Appeals—has considered the admissibility of testimony from a witness who has received EMDR therapy. Dkt. 2 at 120. The fact that the Navy-Marine Court of Criminal Appeals is the only appellate court to consider the admissibility of this type of testimony shows that Petitioner cannot cite to clearly established Supreme Court precedent that requires access to an EMDR expert. The state court of appeals' adjudication of this Ground therefore cannot be deemed contrary to any clearly established federal law. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).

Moreover, even assuming Ground 4 was based on clearly established federal law, Petitioner fails to demonstrate that the state court of appeals' adjudication of Ground 4 was contrary to existing law. Here, the state court of appeals held that the trial court did not abuse its discretion when it denied defense counsel's motion for a continuance after Brown's admission that she received EMDR therapy. Dkt. 10, Ex. 22 at 22–24. The state court of appeals also held that even if the trial court erred by denying the continuance at trial, Petitioner could not show he was prejudiced by that decision. *Id.* at 24–25. The cumulative evidence that Brown offered in her pre-EMDR statements and identifications of Petitioner as a shooter were enough to overcome any prejudice from her post-EMDR statements. *Id.* Analyzing Petitioner's claim in this manner comports with existing law. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–39 (1993) (holding that a court may grant habeas relief only if an error caused the petitioner actual prejudice). Therefore, the state court of appeals' decision was not contrary to existing law.

Thus, the Court recommends that Ground 4 be denied.

REPORT AND RECOMMENDATION - 26

F.  Right to Remain Silent (Grounds 5 and 6)

Grounds 5 and 6 are interrelated. In Ground 5, Petitioner contends the prosecution violated his right to remain silent when it argued to the jury that Petitioner failed to say, "I didn't do this," or "you've got the wrong guy" after being arrested. Dkt. 1 at 13. And in Ground 6, Petitioner asserts the prosecution violated his due process rights and his right to remain silent in its closing argument to the jury, which asked the jury to infer from Petitioner's failure to protest his innocence that he committed a crime. *Id.*

In *Doyle v. Ohio*, the United States Supreme Court held that the right to remain silent contains an implicit assurance that "silence will carry no penalty." 426 U.S. 610, 618 (1976). The Court reasoned that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id. Doyle* therefore establishes that the government may not use a defendant's silence against him or her as evidence of guilt. However, a defendant's pre-arrest or pre-*Miranda* silence may be used for impeachment purposes without violating the federal constitution. *See Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993). And if a defendant gives a statement after receiving *Miranda* warnings, and that statement is arguably inconsistent with his trial court testimony, the prosecutor may inquire into the prior inconsistent statements during cross-examination of the defendant. *See Anderson v. Charles*, 447 U.S. 404, 408–09 (1980). The Ninth Circuit has also stated this reasoning holds even when the defendant fails to testify at trial. *U.S. v. Hoac*, 990 F.2d 1099, 1104 (9th Cir. 1993).

Moreover, no such prohibition applies where a defendant waives his right to remain silent and voluntarily speaks after receiving *Miranda* warnings. *Anderson*, 447 U.S. at 408. "[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to

REPORT AND RECOMMENDATION - 27

remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* As stated by the Ninth Circuit: "[T]alking is not silence. Thus, when a defendant chooses to speak, the prosecutor can, surely, explore that speech and its implications." *Leavitt v. Arave*, 383 F.3d 809, 827 (9th Cir. 2004) (citations omitted). In such circumstances, the prosecutor may appropriately "point out inconsistencies[]" and explore the "omission of critical details[.]" *Id.*

The state court of appeals denied Grounds 5 and 6, ruling:

> Donaldson argues that the prosecutor violated his right to remain silent by commenting on statements he made when he was arrested. He asserts that the prosecutor invited the jury to infer that Donaldson was guilty because he did not claim innocence. Although Donaldson "does not contest the admissibility of the statement he made to police when he was arrested," he argues that the prosecutor violated his right to remain silent by "contrasting his conduct and [postarrest] silence to that of a hypothetical innocent person" and emphasizing Donaldson's "failure to testify to explain his statements." Appellant's Consol. Reply Br. at 2. We disagree.
>
> Donaldson did not object to the prosecutor's comments during closing. When a defendant fails to object, they waive a prosecutorial misconduct claim unless they show that the comments were improper as well as flagrant and ill intentioned, that a curative instruction would not have remedied any prejudice, and that there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). We "'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021) (quoting *Emery*, 174 Wn.2d at 762), *review denied*, 198 Wn.2d 1041, 502 P.3d 854 (2022).
>
> Both the state and federal constitutions guarantee criminal defendants the right to remain silent. U.S. Const. amend. V; Wash. Const. art. I, § 9; *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). Thus, the State cannot use a defendant's silence as substantive evidence of guilt. *State v. Lewis*, 130 Wn.2d 700, 705, 927 P.2d 235 (1996). But a prosecutor "has wide latitude to argue reasonable inferences from the evidence" in closing argument. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). We review the prosecutor's arguments "'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.'" *State v. Thierry*, 190 Wn. App. 680, 689, 360 P.3d 940 (2015) (quoting *Russell*, 125 Wn.2d at 85-86). Donaldson has not challenged the trial court's findings or conclusions admitting his statements under CrR 3.5, so those findings are verities on appeal. *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 755, 294 P.3d 857 (2013).

Donaldson's argument rests on his assertion that the State commented on his right to remain silent when it noted that he failed to claim innocence in statements made during his arrest. He relies on cases addressing pre- and postarrest silence, or cases where a defendant's statements were used to attack their silence. *See Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (prosecutor improperly impeached the defendant's exculpatory story at trial with his silence during his arrest); *State v. Burke*, 163 Wn.2d 204, 222, 181 P.3d 1 (2008) (prosecutor improperly commented on the defendant's prearrest silence when the defendant terminated a police interview); *State v. Belgarde*, 110 Wn.2d 504, 512, 755 P.2d 174 (1988) (prosecutor improperly used the defendant's later statement to comment on "his failure to make a statement immediately upon arrest"); *State v. Fricks*, 91 Wn.2d 391, 396, 588 P.2d 1328 (1979) (prosecutor improperly drew attention to the defendant's silence when arrested); *State v. Pinson*, 183 Wn. App. 411, 418-19, 333 P.3d 528 (2014) (prosecutor improperly used defendant's silence during a custodial interrogation as evidence of guilt). None of those cases addresses commentary on statements that were admitted under CrR 3.5.

Here, the trial court admitted Donaldson's statements during his arrest under CrR 3.5, finding that the statements "were spontaneous, made voluntarily, and were not the product of questions or interrogation." CP at 739. An officer then testified that when Donaldson was arrested he said, "'You've got your prize. Let's go,'" and then without prompting added, "'Okay. I'm 30. I've done everything I wanted to do.'" 13 VRP at 1415. In closing, the prosecutor repeated Donaldson's statements, noting that Donaldson's response to being arrested was "not something like 'you've got the wrong guy,'" and was "nothing like you would expect from someone who didn't do it" but was instead "one of absolute defiance and just indifference, talking about how the officers got their prize." 23 VRP at 2938. The prosecutor then highlighted Donaldson's statement, "'I'm 30. I did everything I wanted to do in my life,'" pointing out that Donaldson was "being arrested for murder. . . . for gunning down a 22-year-old. . . . It's really a callous statement because [Foster] didn't get to do everything in his life that he wants to do. . . . These are not the words of someone who didn't do it." 23 VRP at 2938-39. In rebuttal argument, the prosecutor commented that defense counsel "didn't have one way of explaining away his client's statements when he was arrested." 23 VRP at 2976.

Prosecutors have wide latitude to comment on the evidence in closing argument. *Thorgerson*, 172 Wn.2d at 448. The prosecutor in this case repeated the admitted statements and emphasized the context of the statements. The prosecutor did not use the statements to draw attention to or otherwise comment on Donaldson's later exercise of his right to silence. Donaldson has not cited any case holding that a prosecutor is prohibited from commenting on statements admitted under CrR 3.5. And the prosecutor never implied that Donaldson should have testified to explain his statements; he only drew attention to defense counsel's failure to justify the statements in closing. We hold that there was no improper comment on silence.

Donaldson also contends that the prosecutor inflamed the jury's passion and prejudice by characterizing Donaldson's statements as callous and mentioning

REPORT AND RECOMMENDATION - 29

Foster's young age. Prosecutors overstep their latitude in closing argument if they argue facts that are not in the record or improperly appeal to the passions and prejudices of the jury. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). But a "'prosecutor is not muted because the acts committed arouse natural indignation.'" *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006) (quoting *State v. Fleetwood*, 75 Wn.2d 80, 84, 448 P.2d 502 (1968)). In *Fleetwood*, a prosecutor did not commit misconduct by emphasizing that a robbery defendant beat an 87-year-old victim. 75 Wn.2d at 84. It is permissible for a prosecutor to note the age of a murder victim and acknowledge the fact that their life ended early. We hold that the comments were not improper.

Dkt. 10, Ex. 22 at 28–31.

Petitioner's many arguments in his Brief in Support and Traverse do not demonstrate to the Court that the state court of appeals decision was either contrary to, or constituted an unreasonable application of federal law. Dkt. 2 at; Dkt. 15 at 34–43. The prosecution highlighted the following voluntary statements Petitioner made after being arrested: (1) "You've got your prize. Let's go"; and (2) "Okay. I'm 30. I've done everything I wanted to do." Dkt. 10, Ex. 42 at 107. During trial, the prosecution used these voluntary statements against Plaintiff and argued that they were "not the words of someone who didn't do it." Dkt. 10, Ex. 53 at 57.

While the parties argue over several distinct cases, the prosecution's closing arguments regarding Petitioner's voluntary statements fit within the framework created by *Doyle*, *Anderson*, and *Arave*. *Arave's* holding that "when a defendant chooses to speak, the prosecutor can, surely explore that speech and its implications[]" assists this Court's analysis of the state court of appeals' adjudication of Grounds 5 and 6. 383 F.3d at 827. Based on Petitioner's voluntary statements, it was reasonable for the prosecution to explore the implications of those statements to make arguments concerning Petitioner's guilt. *United States v. Sayetsitty,* 107 F.3d 1405, 1409 (9th Cir.1997) (stating that prosecutors may make reasonable inferences from the evidence presented at trial). And, importantly, "[t]he prosecutor did not use the statements to draw

REPORT AND RECOMMENDATION - 30

attention to or otherwise comment on [Petitioner's] later exercise of his right to silence." Dkt. 10, Ex. 22 at 31.

The prosecution's actions regarding Petitioner's voluntary statements and the implications of those statements fall within the bounds of the principle that "[p]rosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000); *see also United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence"), *as amended on denial of reh'g* (Apr. 15, 1993).

When examining the prosecution's conduct at closing arguments, the state court of appeals did not unreasonably analyze the contours of the Fifth Amendment or misapply *Doyle*. Dkt. 10, Ex 22 at 28–31. In its opinion, the state court of appeals explicitly cited *Doyle* in rejecting Petitioner's arguments and holding that his right to remain silent was not violated. *Id.* at 29. Therefore, Petitioner has failed to demonstrate the state court of appeals' conclusion the State did not violate Petitioner's rights when the prosecution explored the implications of Petitioner's voluntary statements was contrary to, or an unreasonable application of, clearly established federal law. And habeas relief is precluded for these Grounds because the state court of appeals' opinion was not "so lacking in justification that it constitutes an error beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Accordingly, the Court recommends that Grounds 5 and 6 be denied.

**III.        Evidentiary Hearing**

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

REPORT AND RECOMMENDATION - 31

hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). A hearing is not required if the allegations would not entitle Petitioner to relief under § 2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The Court does not find it necessary to hold an evidentiary hearing in this case because, as discussed in this Report and Recommendation, Petitioner should not be entitled to relief under § 2254(d).

**IV.        Certificate of Appealability**

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability ("COA") from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner could satisfy this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or would conclude the issues presented in the Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to this case.

## V.        Conclusion

For the foregoing reasons, the Court concludes Petitioner has not shown the state court of appeals' adjudication of Grounds 1-6 was contrary to, or an unreasonable application of, clearly established federal law. Therefore, the Court recommends the Petition (Dkt. 1) be denied. No evidentiary hearing is necessary and a certificate of appealability should be denied.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit not later than **fourteen (14) days** from the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may be filed by **the day before the noting date**. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 20, 2026**.

Dated this 29th day of December, 2025.

David W. Christel
United States Magistrate Judge

REPORT AND RECOMMENDATION - 33